UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X

GT BIOPHARMA, INC.,                       :  Case No.  16 cv 6910
                                          :
                          Plaintiff,      :
                                          :
                                          :        **COMPLAINT**
              -v-                         :
                                          :  **JURY TRIAL DEMANDED**
EMPERY ASSET MASTER LTD., EMPERY          :
TAX EFFICIENT, L.P., EMPERY TAX           :
EFFICIENT II, L.P., ALTO OPPORTUNITY      :
MASTER FUND, SPC – SEGREGATED             :
MASTER PORTFOLIO B; and DOES 1 through    :
100, inclusive.                           :
------------------------------------------------------------- X

Plaintiff GT Biopharma, Inc. ("Plaintiff" or "GT Biopharma"), by its attorneys, Eisner,

A.P.C., as and for its Complaint against Defendants Empery Asset Master Ltd., Empery Tax

Efficient, L.P., Empery Tax Efficient II, L.P., Alto Opportunity Master Fund, SPC – Segregated

Master Portfolio B, and Does 1 through 100 (collectively "Defendants"), alleges as follows:

### NATURE OF THE ACTION

1.      This action arises out of Defendants' deceptive, fraudulent, and bad faith scheme

to control Plaintiff, a publicly-traded company, and manipulate its share price for the benefit of

Defendants and at the expense of Plaintiff and its shareholders.  Plaintiff and Defendants are

parties to a January 22, 2018 Securities Purchase Agreement, pursuant to which Plaintiff issued

to Defendants senior convertible notes (convertible at $4.58/share) as well as warrants

(exercisable at $4.58/share) to purchase a significant percentage of Plaintiff's common stock.

Both the exercise and conversion prices were subject to downward adjustment based on the

Company's share price.  Upon information and belief, in order to take advantage of this

adjustment right, immediately after the Securities Purchase Agreement was entered into and

continuing thereafter, Defendants or those acting on their behalf caused to be short sold

Plaintiff's stock in sufficient volume to drive down the share price approximately 53% from $4.58 per share to as low as $2.13 per share and destroy over $100 million in market capitalization in only a matter of months.

2.      At the same time they were surreptitiously shorting Plaintiff's stock, Defendants were repeatedly and falsely representing to Plaintiff that Defendants intended to extend the July 23, 2018 maturity date on the senior convertible notes (the "Maturity Date") and/or intended to convert a significant portion of the notes to common stock on the Maturity Date.  Defendants even used these deceptions to attempt to wield control over Plaintiff's operations.  On July 13, 2018, for example, Defendants agreed to provide much needed additional capital and to extend the Maturity Date, but not unless Plaintiff replaced its CEO.

3.      Upon information and belief, despite their repeated misrepresentations, Defendants had no intention of extending the Maturity Date, and only days before, Defendants revealed that they would not extend or amend the note in any way and "suggest[ed] [Plaintiff] figure-out how to pay us off quickly."  Defendants also informed Plaintiff that they would not be converting any of their notes to common stock in lieu of repayment of principal.

4.      As a direct result of Defendants' false assurances that the Maturity Date would be extended, Plaintiff planned to complete a capital raise in August, in advance of the extended maturity date that had been discussed, and did not complete an additional financing in advance of the Maturity Date.

5.      Indeed, left with virtually no time to complete its capital raise, Plaintiff was unable to timely pay off the notes on July 23.  That afternoon, Plaintiff sent Defendants a letter stating that it would be unable to pay off the notes, but also that it was in the process of finalizing a capital raise that would enable it to pay the outstanding principal on the notes plus default

interest and late charges.  Plaintiff is informed and believes and thereon alleges that on July 25,

2018, armed with the material non-public information shared by Plaintiff on July 23, Defendants

wrongfully traded on that material non-public information by causing Plaintiff's stock to be

heavily shorted.  On July 25, Plaintiff's share price dropped nearly 20%.



6.      In addition, Plaintiff is informed and believes and thereon alleges that on July 27,

2018, Defendant Alto Opportunity Master Fund, SPC – Segregated Master Portfolio B, traded on

the same material non-public information when it suddenly elected to convert a portion of its

notes to Plaintiff's common stock at its artificially depressed price.

7.      Defendants' deceptive, fraudulent, and bad faith scheme to control Plaintiff and

manipulate its share price for the benefit of Defendants directly and proximately caused

substantial damage to Plaintiff and its shareholders.  First, Plaintiff's share price has plummeted

in value 53% from approximately $4.58 per share to approximately $2.13 per share, and

Plaintiff's market capitalization has shrunk from approximately $230 million down to

approximately $107 million.  Second, Plaintiff has and continues to incur default interest payments and late charge payments as a result of its default on the Notes.  Third, upon information and belief, Defendants wrongfully traded on material non-public information when they caused Plaintiff's stock to be heavily short sold on July 25, 2018, which further drove down Plaintiff's share price and caused another downward adjustment to the conversion price on the notes.  Fourth, as a result of its artificially depressed share price and last-minute scramble to raise capital caused by Defendants' misrepresentations, Plaintiff now has no choice but to attempt to raise capital on severely disadvantageous terms.  The terms of such raise will almost certainly trigger yet a further downward adjustment in the exercise price of the warrants as well, severely reducing the amount of capital that will be provided to Plaintiff upon exercise of those warrants. Fifth, the decline in the value of Plaintiff's common stock resulting from Defendants' wrongful conduct and misrepresentations has impaired Plaintiff's financial and business viability, hindered its ability to engage in other financing on favorable terms, and otherwise adversely affected its standing within the business community.

8.     Plaintiff is currently in process of closing another financing, which is expected to close as soon as possible.

9.     Plaintiff now brings this action seeking monetary damages and rescission of the Securities Purchase Agreement.

## JURISDICTION AND VENUE

10.     The claims asserted herein arise under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder by the SEC, and under state law.  In connection with the acts, conduct, and other wrongs complained of herein,

Defendants directly or indirectly used the means and instrumentalities of interstate commerce, the United States mails, and the facilities of a national securities market.

11.     This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 78aa and the principles of supplemental jurisdiction embodied in 28 U.S.C. § 1367.  The state and common law claims form part of the same case or controversy as, and are related to, those claims over which the Court has Federal Question jurisdiction.

12.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(c).

## THE PARTIES

13.     Plaintiff GT Biopharma, Inc. is a publicly traded Delaware Corporation with headquarters located at 100 South Ashley Dr., Suite 600, Tampa, Florida 33602.  Plaintiff is a clinical stage biopharmaceutical company focused on the development and commercialization of cancer-fighting medications. Shares of Plaintiff's common stock ("Common Stock") are publicly traded on the OTCQB under the ticker symbol "GTBP."  There are currently 50,117,977 shares of Common Stock issued and outstanding.

14.     Defendant Empery Asset Master Ltd. is a Cayman Islands Limited Company with an address of 1 Rockefeller Plaza, Suite 1205, New York, New York 10020.  Upon information and belief, Defendant Empery Asset Master Ltd.'s principal place of business is New York. Defendant Empery Asset Master Ltd. is an affiliate of third-party Empery Asset Management, L.P.

15.     Defendant Empery Tax Efficient, L.P. is a Delaware Limited Partnership with an address of 1 Rockefeller Plaza, Suite 1205, New York, New York 10020 and a Registered Agent address of 251 Little Falls Drive, Wilmington, DE 19808.  Upon information and belief,

Defendant Empery Tax Efficient, L.P.'s principal place of business is New York. Defendant Empery Tax Efficient, L.P. is an affiliate of third-party Empery Asset Management, L.P.

16.     Defendant Empery Tax Efficient II, L.P. is a Delaware Limited Partnership with an address of 1 Rockefeller Plaza, Suite 1205, New York, New York 10020 and a Registered Agent address of 251 Little Falls Drive, Wilmington, DE 19808. Upon information and belief, Defendant Empery Tax Efficient II, L.P.'s principal place of business is New York. Defendant Empery Tax Efficient II, L.P. is an affiliate of third-party Empery Asset Management, L.P.

17.     Defendant Alto Opportunity Master Fund, SPC – Segregated Master Portfolio B is a Cayman Islands Special Purpose Company with an address of 1180 Avenue of the Americas, Suite 842, New York, New York 10036. Upon information and belief, Defendant Alto Opportunity Master Fund, SPC – Segregated Master Portfolio B's principal place of business is New York. Defendant Alto Opportunity Master Fund, SPC – Segregated Master Portfolio B is an affiliate of Ayrton Capital LLC.

18.     The true names and capacities, whether individual, corporate, associate, or otherwise, of the fictitiously named defendants Does 1 through 100, inclusive, are unknown to Plaintiff at this time. Therefore, Plaintiff sues these defendants by such fictitious names and will seek leave of court to amend this complaint to show their true names and capacities when their names have been ascertained. Plaintiff is informed and believes, and on that basis alleges, that each of the defendants designated herein as a Doe is responsible in some manner for the events and happening and the damages suffered by Plaintiff, as alleged herein, as well as proximately caused such damages described herein. Further, each Doe defendant is, and at all times mentioned was, a resident of New York and/or authorized to do business, and conduct said business in, the State of New York.

## FACTUAL ALLEGATIONS

### The Securities Purchase Agreement

19.     On or about January 22, 2018, Plaintiff entered into a Securities Purchase Agreement ("SPA") with fourteen accredited investors (individually, a "Buyer" and collectively, the "Buyers"), four of whom are Defendants. A true and correct copy of the SPA is attached to this Complaint as **Exhibit A** and is incorporated by reference herein.

20.     Pursuant to the SPA, Plaintiff issued to the Buyers senior convertible notes in an aggregate principal amount of $7,760,507.77 (the "Notes"), which Notes were convertible at any time prior to maturity into common shares of Common Stock, par value $0.001 per share, and five-year warrants ("Warrants") to purchase 1,694,442 shares of Common Stock. With respect to any additional issuance of securities by Plaintiff (an "Additional Issuance"), the SPA also provides that Plaintiff must irrevocably offer to issue and sell to or exchange with Buyers at least 35% of any securities offered pursuant to such Additional Issuance, allocated among Buyers based on such Buyer's pro rata portion of the aggregate principal amount of Notes purchased under the SPA. True and correct copies of the Notes issued to Defendants are attached to this Complaint as **Exhibits B – E** and are incorporated by reference herein. True and correct copies of the Warrants issued to Defendants are attached to this Complaint as **Exhibits F – I** and are incorporated by reference herein.

21.     The Notes matured on July 23, 2018 (the "Maturity Date"). Pursuant to the terms of the SPA, the Notes are convertible, at the option of Buyers and at any time prior to payment in full, into Common Stock at a price of $4.58 per share ("Conversion Price"). However, under certain conditions, the Conversion Price is subject to downward adjustment depending upon the price and structure of an Additional Issuance, or if Plaintiff defaults and is unable to cure. For

example, if Plaintiff issues new convertible debt with a conversion price below $4.58 per share, the Conversion Price of the Notes immediately thereafter is adjusted downward to that new conversion price.  If Plaintiff defaults and a Noteholder delivers to Plaintiff an Event of Default Redemption Notice, Plaintiff is required to pay that Noteholder within three business days.  If unable to do so, the Conversion Price is adjusted downward to the lowest of: (i) the conversion price then in effect; (ii) 85% of the lowest Common Stock closing price during the three days following receipt of the Event of Default Redemption Notice; and (iii) 85% of the quotient of (A) the sum of the five lowest weighted average prices of the Common Stock during the preceding twenty consecutive trading day period divided by (B) five.

22.     Pursuant to the SPA, the Buyers also received Warrants to purchase an aggregate of 1,694,440 shares of Common Stock.  The Warrants are exercisable for five years from the date the shares underlying the Warrants are freely saleable.  The initial exercise price is $4.58 per share ("Exercise Price").  However, the Exercise Price is subject to downward adjustment depending upon the price and structure of an Additional Issuance.  For example, if Plaintiff issues new convertible debt with a conversion price below the $4.58, the Exercise Price on the Warrants immediately thereafter is adjusted downward to that new conversion price.

### Plaintiff's Issuances to Defendants under the SPA

23.     Pursuant to the SPA, and in exchange for the purchase price of $876,000.00, Plaintiff issued to Defendant Empery Asset Master Ltd. Notes in the aggregate principal amount of $963,600.96 and Warrants representing the right of Defendant Empery Asset Master Ltd. to acquire an aggregate of 210,394 shares of Common Stock.

24.     Pursuant to the SPA, and in exchange for the purchase price of $333,000.00, Plaintiff issued to Defendant Empery Tax Efficient, L.P. Notes in the aggregate principal amount

of $366,300.37 and Warrants representing the right of Defendant Empery Tax Efficient, L.P. to

acquire an aggregate of 79,979 shares of Common Stock.

25.     Pursuant to the SPA, and in exchange for the purchase price of $791,000.00,

Plaintiff issued to Defendant Empery Tax Efficient II, L.P. Notes in the aggregate principal

amount of $870,100.87 and Warrants representing the right of Defendant Empery Tax Efficient

II, L.P. to acquire an aggregate of 189,979 shares of Common Stock.

26.     Pursuant to the SPA, and in exchange for the purchase price of $2,000,000.00,

Plaintiff issued to Defendant Alto Opportunity Master Fund, SPC – Segregated Master Portfolio

B Notes in the aggregate principal amount of $2,200,002.20 and Warrants representing the right

of Defendant Alto Opportunity Master Fund, SPC – Segregated Master Portfolio B to acquire an

aggregate of 480,350 shares of Common Stock.

27.     Pursuant to the SPA, on or about January 23, 2018, Plaintiff issued a press release

and filed a current report on S.E.C. Form 8-K describing the terms of the transactions entered

into pursuant to the SPA (the "Public Announcement").

### Plaintiff Begins Considering Another Financing

28.     In addition to the SPA, Plaintiff has negotiated and closed various financings over

the course of its history.  And in addition to Defendants, Plaintiff has relationships with multiple

investors that either have participated or have offered to participate in multiple of those

financings.  Typically, each financing requires several weeks from the time initial negotiations

begin to the time the financing deal closes.

29.     Although Plaintiff could have used its cash and/or investor funds that were

available to Plaintiff at various times to pay off the Notes at the Maturity Date, it elected to

devote its cash and resources to operating expenses and other expenditures, and to not take in

new funds from investors so quickly.  Because Defendants assured Plaintiff they were not

shorting Plaintiff's stock and because Defendants also assured Plaintiff that the Maturity Date

would be extended, Plaintiff had no reason to insist that it pay off the Notes at Maturity, and

planned its next capital raise to take place based on an extended maturity date.

30.     Plaintiff did not desire to enter into a financing arrangement with any party that

was shorting the Common Stock or causing to be shorted the Common Stock.  Initially, in or

around June 2018, Plaintiff approached various potential investors who had already participated

or offered to participate in its previous financings.  Among those Plaintiff approached were

Defendants.  Those discussions resulted in significant interest from various investors, and

Plaintiff moved those discussions forward with an eye towards an August 2018 closing date,

based on Defendants' assurances that the Maturity Date would be extended into at least August

2018.

### Defendants Falsely Represent They Were Not Shorting Plaintiff's Stock

31.     On or about June 20, 2018, Ryan Lane of third-party Empery Asset Management,

L.P., which is an affiliate of the Empery Defendants, met with Plaintiff's current CEO, Raymond

Urbanski, former CEO, Shawn Cross, and Director of Strategic Operations, Karen Moraleda.  At

the meeting, Mr. Lane represented to Plaintiff that Defendants were not causing Plaintiff's stock

to be shorted (the "June 20 Misrepresentation").

32.     On or about July 9, 2018, Mr. Lane participated in a telephone call with Mr.

Urbanski as well as Plaintiff's CFO and Director, Steven Weldon, and Director, Anthony

Cataldo.  During the telephone call, Mr. Lane represented to Plaintiff that Defendants were not

causing Plaintiff's stock to be shorted (the "July 9 Misrepresentation").

33.     However, shortly prior to and after the Public Announcement, the Common Stock

traded at above-average volumes on the sell side leading to a precipitous drop in share price.  On

January 22, 2018, the Common Stock closed at a price of $4.58 per share.  On January 23, 2018,

the Common Stock closed at a price of $2.97 per share.  By May 4, 2018, the Common Stock

closed at only $1.25 per share, and on July 20, 2018—the last market day prior to the Maturity

Date—the Common Stock closed at $2.18 per share.

34.     Plaintiff is informed and believes and thereon alleges that at the times Defendants

made the June 20 Misrepresentation and July 9 Misrepresentation, Defendants knew that they

were false and that Defendants were causing the Common Stock to be shorted.

35.     Plaintiff is informed and believes and thereon alleges that Defendants caused the

Common Stock to be shorted through certain of their third-party affiliates and/or brokers.  For

example, Northland Securities, Inc., a securities brokerage firm, and Oppenheimer & Co. Inc., an

investment firm, began heavily shorting Common Stock only shortly after Defendants entered

into the SPA.  Plaintiff is informed and believes and thereon alleges that Defendants instructed or

otherwise caused Northland Securities, Inc. and Oppenheimer & Co. Inc. to drive down

Plaintiff's share price by short selling its Common Stock.  The Vertical Group, a venture capital

firm, began shorting Plaintiff's Common Stock beginning on July 25, 2018, contributing heavily

to that day's approximately 20% drop in Plaintiff's share price.  Plaintiff is informed and

believes and thereon alleges that Defendants instructed or otherwise caused The Vertical Group

to drive down Plaintiff's share price by short selling its Common Stock.

36.     Plaintiff reasonably relied on the June 20 Misrepresentation and July 9

Misrepresentation by forgoing early efforts to raise capital from sources other than Defendants

and electing not to devote cash assets and investor funds that were available at various times

between January 22 and July 23, 2018 to paying off Defendants' Notes at Maturity rather than to other company expenses.

### Defendants Falsely Represent They Would Extend the Notes

37.    On or about July 11, 2018, Mr. Urbanski and Mr. Weldon met with Mr. Lane (the "July 11 Meeting"). The meeting was held at Empery Asset Management, L.P.'s offices at 1 Rockefeller Plaza, Suite 1205, New York, New York, 10020. The purpose of the July 11 meeting was in part to discuss the then-upcoming July 23, 2018 Maturity Date of the Notes.

38.    At the July 11 Meeting, Mr. Urbanski proposed extending the Maturity Date to August 30, 2018. Mr. Lane verbally agreed to extend the Maturity Date to August 15, and further verbally agreed that the Empery Defendants would convert half of the Notes to Common Stock (the "July 11 Misrepresentation").

39.    At the July 11 Meeting, Mr. Urbanski informed Mr. Lane that he would be meeting the next day with Waqas Khatri, managing member of third-party Ayrton Capital LLC, which is an affiliate of Defendant Alto Opportunity Master Fund, SPC – Segregated Master Portfolio B. Mr. Lane suggested that the three participate in a teleconference during the meeting.

40.    On or about July 12, 2018, Mr. Urbanski met with Mr. Khatri to discuss extending the Maturity Date of the Notes (the "July 12 Meeting"). After approximately 30 minutes of discussion, they called Mr. Lane, who suggested that the Empery Defendants may be willing to raise approximately $4 million in working capital and extend the Maturity Date six months if he could convince Ayrton to extend the Maturity Dates on its Notes as well. Mr. Khatri stated that he would think about it, and Mr. Lane stated that he would call back the next day.

41.    On or about July 13, 2018, Mr. Lane called Mr. Urbanski back to again discuss the upcoming Maturity Date and his proposal from the July 12 Meeting. During that call, and in

a confirmatory email exchange that followed shortly thereafter, Mr. Lane represented that the Empery Defendants were working in conjunction with Ayrton to raise approximately $4 million in capital and would extend the Maturity Date by six months (the "July 13 Misrepresentation," and collectively with the June 20 Misrepresentation, July 9 Misrepresentation, and the July 11 Misrepresentation, the "Misrepresentations"). In exchange, Defendants demanded Plaintiff agree to meet with a potential replacement for Mr. Urbanski as CEO.

42.    However, on or about July 18, 2018—just days before the Maturity Date—the Empery Defendants informed Plaintiff that they "will not be extending or amending the note in anyway. I suggest you figure-out how to pay us off quickly." Ayrton also refused to extend the Maturity Date.

43.    Plaintiff is informed and believes and thereon alleges that at the time Defendants made the July 11 Misrepresentation and the July 13 Misrepresentation, Defendants knew they were false because Defendants knew they were not going to agree to extend the Maturity Date.

44.    Plaintiff reasonably relied on the July 11 Misrepresentation and July 13 Misrepresentation by forgoing early efforts to raise capital from sources other than Defendants and electing not to devote cash assets and investor funds that were available at various times between January 22 and July 23, 2018 to paying off Defendants' Notes at Maturity rather than to other company expenses.

### Defendants' Fraudulent Scheme Damages Plaintiff and Its Shareholders

45.    Plaintiff was unable to pay the Notes on July 23. Instead, its counsel sent a letter that day to the Empery Defendants and Ayrton stating that Plaintiff was currently finalizing a capital raise and expected to pay the full amount owing to each Defendant, including applicable interest and late charges, by Friday, July 26, 2018.

46.     On July 23, 2018, at approximately 5:41 p.m. EDT, the Empery Defendants sent to Plaintiff an Event of Default Redemption Notice stating that they were not converting any Notes to Common Stock, and demanding immediate and full payment on the Notes.  Pursuant to the terms of the Notes, Plaintiff had until July 26 to make such payment, including whatever default interest and late charges accrued until payment.

47.     On July 23, 2018, at approximately 5:55 p.m. EDT, Ayrton sent to Plaintiff an Event of Default Redemption Notice stating that it was not converting any Notes to Common Stock, and demanding immediate and full payment on the Notes.  Pursuant to the terms of the Notes, Plaintiff had until July 26 to make such payment, including whatever default interest and late charges accrued until payment.

48.     Plaintiff is informed and believes and thereon alleges that on July 25, 2018, Defendants traded on the material non-public information contained in Plaintiff's July 23 letter by causing Plaintiff's stock to be heavily shorted.  On July 25 alone, Plaintiff's share price suddenly plummeted approximately 20% from $2.78 per share to $2.21 per share.

49.     Plaintiff was unable to pay Defendants on July 26, 2018.  Accordingly, and pursuant to the terms of the Notes, the conversion price of the Notes immediately was adjusted downward approximately 73% from $4.58 per share to $1.2215 per share, representing "85% of the quotient of (I) the sum of the five (5) lowest Weighted Average Prices of the Common Stock during the twenty (20) consecutive Trading Day period ending on and including the Trading Day immediately preceding the applicable Conversion Date divided by (II) five (5)."

50.     Plaintiff is informed and believes and thereon alleges that Ayrton traded on the material non-public information contained in Plaintiff's July 23 letter by electing to convert a portion of its Notes to Common Stock.  On July 27, 2018, at approximately 8:14 a.m. EDT,

Ayrton sent to Plaintiff a Conversion Notice electing to convert $40,000 of its Notes to 32,747 shares of Common Stock at the price of $1.2215 per share.

51.     The Empery Defendants did not elect to convert any portion of their Notes to Common Stock.

52.     As holders of (i) convertible notes with an adjustable conversion price, (ii) warrants with an adjustable exercise price, and (iii) rights under the SPA to participate in any Additional Issuance, Defendants had incentive to fraudulently depress Plaintiff's Common Stock price while also fraudulently inducing Plaintiff to default on the Notes.

53.     A lower Common Stock price does not harm the value of Defendants' Notes because they still could demand full payment on the Notes on the Maturity Date, irrespective of the Common Stock price.  And Defendants stand gain from late payment on the Notes because the terms of the SPA provide for a 10% per annum default interest rate and an additional 5% per annum "late charge."  However, a depressed Common Stock price along with Plaintiff's default gave Defendants the *option* to acquire additional shares of Common Stock at significantly reduced prices based off of the depressed Common Stock price.

54.     In addition, a lower Common Stock price also enhances the value of Defendants' Warrants if Plaintiff is forced into an Additional Issuance at depressed share prices in order to pay off the Notes on the Maturity Date.  For example, on the last trading day before the Maturity Date, the price of Common Stock closed at approximately $2.18 per share.  Even if Plaintiff had been able to raise the capital needed to pay off the Notes by Maturity via an Additional Issuance at $2.18 per share, the value of Defendants' Warrants would suddenly more than double since they would instantly be exercisable at the $2.18 per share price rather than $4.58 per share.

55.     Further still, Defendants could fully realize these improperly obtained windfalls while continuing to exercise control over Plaintiff because, under the terms of the SPA, Plaintiff was obligated to allow Defendants to participate in any Additional Issuance.

56.     As a direct and proximate cause of their deceptive, fraudulent, and bad faith misconduct, Defendants have damaged Plaintiff.  First, the Common Stock price has plummeted in value by 53% from approximately $4.58 per share to approximately $2.13 per share, and Plaintiff's market capitalization has shrunk from approximately $230 million down to approximately $107 million.  Second, Plaintiff has and continues to incur default interest payments and late charge payments as a result of its default on the Notes.  Third, upon information and belief, Defendants wrongfully traded on material non-public information when they caused Plaintiff's stock to be heavily short sold on July 25, 2018, which further drove down Plaintiff's share price and caused another downward adjustment to the conversion price on the Notes.  Fourth, as a result of its artificially depressed share price and last-minute scramble to raise capital caused by Defendants' Misrepresentations, Plaintiff now has no choice but to attempt to raise capital on severely disadvantageous terms.  As a result of its depressed Common Stock price, the terms of such raise will almost certainly trigger yet a further downward adjustment in the exercise price of the Warrants as well, severely reducing the amount of capital that will be provided to Plaintiff upon exercise of those Warrants.  Fifth, the decline in the value of Plaintiff's Common Stock resulting from Defendants' wrongful conduct and misrepresentations has impaired Plaintiff's financial and business viability, hindered its ability to engage in other financing on favorable terms and otherwise adversely affected its standing within the business community.

## FIRST CAUSE OF ACTION

**(Violations of § 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated by the Securities and Exchange Commission)**

57.     Plaintiff repeats and realleges paragraphs 1 through 56 as if fully set forth herein.

58.     As set forth above, Defendants, directly or indirectly, in connection with the purchase or sale of securities, and by use of the means or instrumentalities of interstate commerce, the mails, or a facility of any national securities exchange: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, and courses of business which operated or would operate as a fraud or deceit upon Plaintiff or other persons.

59.     Specifically, and as set forth above, Defendants engaged in: (i) a pattern of misrepresentations and omissions intended to and having the effect of inducing Plaintiff to forgo an early effort to raise capital on favorable terms in advance of the Maturity Date; (ii) conduct to manipulate downward the market price of Plaintiff's Common Stock; and (iii) wrongfully trading on material non-public information.  Each of these forms of conduct constitutes an independent violation of § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

60.     As is described above, in connection with the SPA and the Notes and Warrants issued thereunder, Defendants made numerous false representations of material fact to Plaintiff, including the June 20 and July 9 Misrepresentations that Defendants were not causing to be shorted the Common Stock, and the July 11 and July 13 Misrepresentations that Defendants intended to extend the Maturity Date on the Notes.

61.     Upon information and belief, Defendants made the Misrepresentations with the knowledge and belief that the Misrepresentations were false at the time they were made.

62.     Plaintiff is informed and believes and thereon alleges that Defendants caused the Common Stock to be shorted through certain of their third-party affiliates and/or brokers.  For example, Northland Securities, Inc., a securities brokerage firm, and Oppenheimer & Co. Inc., an investment firm, began heavily shorting Common Stock only shortly after Defendants entered into the SPA.  Plaintiff is informed and believes and thereon alleges that Defendants instructed or otherwise caused Northland Securities, Inc. and Oppenheimer & Co. Inc. to drive down Plaintiff's share price by short selling its Common Stock.  The Vertical Group, a venture capital firm, began shorting Plaintiff's Common Stock beginning on July 25, 2018, contributing heavily to that day's approximately 20% drop in Plaintiff's share price.  Plaintiff is informed and believes and thereon alleges that Defendants instructed or otherwise caused The Vertical Group to drive down Plaintiff's share price by short selling its Common Stock.

63.     In addition, Defendants did not extend the Maturity Date.  Upon information and belief, at the time of the July 11 and July 13 Misrepresentations, Defendants knew that they did not intend to extend the Maturity Date.

64.     Plaintiff reasonably and justifiably relied on Defendants' Misrepresentations by forgoing early efforts to raise capital from sources other than Defendants and electing not to devote cash assets and investor funds that were available at various times between January 22 and July 23, 2018 to paying off Defendants' Notes at Maturity rather than to other company expenses.

65.     Upon information and belief, Defendants' true intent was to engage in a scheme and common plan to cause to be short sold Plaintiff's Common Stock leading up to the Maturity

Date and to wrongfully induce Plaintiff into either defaulting on the Notes or undertaking a capital raise via an Additional Issuance.  Owing to the artificially depressed Common Stock price, either a default on the Notes or an Additional Issuance would necessarily result in a downward adjustment of both the Conversion Price on the Defendants' Notes and the Exercise Price on the Defendants' Warrants.

66.     Further, on July 27, 2018, Ayrton elected to convert $40,000 of Notes into Common Stock.  At the time of its election, Ayrton was in possession of material non-public information about Plaintiff.  Specifically, Plaintiff had advised only Defendants on July 23, 2018 that Plaintiff was currently finalizing a capital raise and expected to pay the full amounts owing to Defendants, including interest and late charges, by Friday, July 26, 2018.

67.     By electing to convert $40,000 of Notes into Common Stock on the basis of material non-public information about Plaintiff, Ayrton breach a duty of trust or confidence that it owed to Plaintiff and its shareholders.

68.     As a direct and proximate cause of their deceptive, fraudulent, and bad faith misconduct, Defendants have damaged Plaintiff.  First, the Common Stock price has plummeted in value by 53% from approximately $4.58 per share to approximately $2.13 per share, and Plaintiff's market capitalization has shrunk from approximately $230 million down to approximately $107 million.  Second, Plaintiff has and continues to incur default interest payments and late charge payments as a result of its default on the Notes.  Third, upon information and belief, Defendants wrongfully traded on material non-public information when they caused Plaintiff's stock to be heavily short sold on July 25, 2018, which further drove down Plaintiff's share price and caused another downward adjustment to the conversion price on the Notes.  Fourth, as a result of its artificially depressed share price and last-minute scramble to

19

raise capital caused by Defendants' Misrepresentations, Plaintiff now has no choice but to attempt to raise capital on severely disadvantageous terms.  As a result of its depressed Common Stock price, the terms of such raise will almost certainly trigger yet a further downward adjustment in the exercise price of the Warrants as well, severely reducing the amount of capital that will be provided to Plaintiff upon exercise of those Warrants.  Fifth, the decline in the value of Plaintiff's Common Stock resulting from Defendants' wrongful conduct and misrepresentations has impaired Plaintiff's financial and business viability, hindered its ability to engage in other financing on favorable terms and otherwise adversely affected its standing within the business community.

## SECOND CAUSE OF ACTION

### (Fraud)

69.     Plaintiff repeats and realleges paragraphs 1 through 68 as if fully set forth herein.

70.     As is described above, Defendants made numerous false representations of material fact to Plaintiff, including the June 20 and July 9 Misrepresentations that Defendants were not causing to be shorted Plaintiff's Common Stock and the July 11 and July 13 Misrepresentations that Defendants intended to extend the Maturity Date on the Notes.

71.     Upon information and belief, Defendants made the Misrepresentations with the knowledge and belief that the Misrepresentations were false at the time they were made.

72.     Upon information and belief, Defendants made the Misrepresentations knowing and intending that Plaintiff would rely on Defendants' statements by forgoing early efforts to raise capital from sources other than Defendants and electing not to devote cash assets and investor funds that were available at various times between January 22 and July 23, 2018 to paying off Defendants' Notes at Maturity rather than to other company expenses.

73.     Plaintiff justifiably relied on Defendants' Misrepresentations by forgoing early efforts to raise capital from sources other than Defendants and electing not to devote cash assets and investor funds that were available at various times between January 22 and July 23, 2018 to paying off Defendants' Notes at Maturity rather than to other company expenses.

74.     As a direct and proximate cause of their deceptive, fraudulent, and bad faith misconduct, Defendants have damaged Plaintiff.  First, the Common Stock price has plummeted in value by 53% from approximately $4.58 per share to approximately $2.13 per share, and Plaintiff's market capitalization has shrunk from approximately $230 million down to approximately $107 million.  Second, Plaintiff has and continues to incur default interest payments and late charge payments as a result of its default on the Notes.  Third, upon information and belief, Defendants wrongfully traded on material non-public information when they caused Plaintiff's stock to be heavily short sold on July 25, 2018, which further drove down Plaintiff's share price and caused another downward adjustment to the conversion price on the Notes.  Fourth, as a result of its artificially depressed share price and last-minute scramble to raise capital caused by Defendants' Misrepresentations, Plaintiff now has no choice but to attempt to raise capital on severely disadvantageous terms.  As a result of its depressed Common Stock price, the terms of such raise will almost certainly trigger yet a further downward adjustment in the exercise price of the Warrants as well, severely reducing the amount of capital that will be provided to Plaintiff upon exercise of those Warrants.  Fifth, the decline in the value of Plaintiff's Common Stock resulting from Defendants' wrongful conduct and misrepresentations has impaired Plaintiff's financial and business viability, hindered its ability to engage in other financing on favorable terms and otherwise adversely affected its standing within the business community.

### THIRD CAUSE OF ACTION

**(Constructive Fraud)**

75.     Plaintiff repeats and realleges paragraphs 1 through 74 as if fully set forth herein.

76.     As is described above, Defendants made numerous false representations of material fact to Plaintiff, including the July 20 and July 9 Misrepresentations that Defendants were not causing to be shorted Plaintiff's Common Stock and the July 11 and July 13 Misrepresentations that Defendants would extend the Maturity Date on the Notes.

77.     Upon information and belief, Defendants made the Misrepresentations knowing and intending that Plaintiff would rely on Defendants' statements by forgoing early efforts to raise capital from sources other than Defendants and electing not to devote cash assets and investor funds that were available at various times between January 22 and July 23, 2018 to paying off Defendants' Notes at Maturity rather than to other company expenses.

78.     After entering into the SPA, Plaintiff and Defendants were in a confidential relationship.  Defendants not only held or still hold a significant percentage of the Notes and Warrants, but also have the right to participate in any Additional Issuance by Plaintiff.  As such, Defendants possessed a position of superiority and influence over the Plaintiff, evidenced by, among other things, its ability to depress the Common Stock share price and its ability to make its (false) promise of additional financing and an extension of the Maturity Date contingent upon Plaintiff replacing its CEO.

79.     By virtue of this confidential relationship, Plaintiff was warranted in reposing its confidence in Defendants and relaxing the care and vigilance it would ordinarily exercise under the circumstances.

80.     Plaintiff justifiably relied on Defendants' Misrepresentations by forgoing early efforts to raise capital from sources other than Defendants and electing not to devote cash assets and investor funds that were available at various times between January 22 and July 23, 2018 to paying off Defendants' Notes at Maturity rather than to other company expenses.

81.     As a direct and proximate cause of their deceptive, fraudulent, and bad faith misconduct, Defendants have damaged Plaintiff.  First, the Common Stock price has plummeted in value by 53% from approximately $4.58 per share to approximately $2.13 per share, and Plaintiff's market capitalization has shrunk from approximately $230 million down to approximately $107 million.  Second, Plaintiff has and continues to incur default interest payments and late charge payments as a result of its default on the Notes.  Third, upon information and belief, Defendants wrongfully traded on material non-public information when they caused Plaintiff's stock to be heavily short sold on July 25, 2018, which further drove down Plaintiff's share price and caused another downward adjustment to the conversion price on the Notes.  Fourth, as a result of its artificially depressed share price and last-minute scramble to raise capital caused by Defendants' Misrepresentations, Plaintiff now has no choice but to attempt to raise capital on severely disadvantageous terms.  As a result of its depressed Common Stock price, the terms of such raise will almost certainly trigger yet a further downward adjustment in the exercise price of the Warrants as well, severely reducing the amount of capital that will be provided to Plaintiff upon exercise of those Warrants.  Fifth, the decline in the value of Plaintiff's Common Stock resulting from Defendants' wrongful conduct and misrepresentations has impaired Plaintiff's financial and business viability, hindered its ability to engage in other financing on favorable terms and otherwise adversely affected its standing within the business community.

## FOURTH CAUSE OF ACTION

### (Negligent Misrepresentation)

82.     Plaintiff repeats and realleges paragraphs 1 through 81 as if fully set forth herein.

83.     After entering into the SPA, Plaintiff and Defendants were in a confidential relationship.  Defendants not only held or still hold a significant percentage of the Notes and Warrants, but also have the right to participate in any Additional Issuance by Plaintiff.  As such, Defendants possessed a position of superiority and influence over the Plaintiff, evidenced by, among other things, its ability to depress the Common Stock share price and its ability to make its (false) promise of additional financing and an extension of the Maturity Date contingent upon Plaintiff replacing its CEO.

84.     By virtue of the confidential relationship, Plaintiff was warranted in reposing its confidence in Defendants and relaxing the care and vigilance it would ordinarily exercise under the circumstances.

85.     As is described above, Defendants made numerous false representations of material fact to Plaintiff, including the June 20 and July 9 Misrepresentations that Defendants were not causing to be shorted Plaintiff's Common Stock and the July 11 and July 13 Misrepresentations that Defendants would extend the Maturity Date on the Notes.

86.     Upon information and belief, Defendants made the Misrepresentations carelessly, or with knowledge and belief that the Misrepresentations were false at the time they were made.

87.     Upon information and belief, Defendants made the Misrepresentations expecting that Plaintiff would rely on Defendants' Misrepresentations by forgoing early efforts to raise capital from sources other than Defendants and electing not to devote cash assets and investor

funds that were available at various times between January 22 and July 23, 2018 to paying off Defendants' Notes at Maturity rather than to other company expenses.

88.     Plaintiff reasonably and justifiably relied on Defendants' Misrepresentations by forgoing early efforts to raise capital from sources other than Defendants and electing not to devote cash assets and investor funds that were available at various times between January 22 and July 23, 2018 to paying off Defendants' Notes at Maturity rather than to other company expenses.

89.     Defendants expressed the Misrepresentations directly to Plaintiff with whom Defendants were bound by a confidential relationship, and with knowledge they be acted on.

90.     As a direct and proximate cause of their deceptive, fraudulent, and bad faith misconduct, Defendants have damaged Plaintiff.  First, the Common Stock price has plummeted in value by 53% from approximately $4.58 per share to approximately $2.13 per share, and Plaintiff's market capitalization has shrunk from approximately $230 million down to approximately $107 million.  Second, Plaintiff has and continues to incur default interest payments and late charge payments as a result of its default on the Notes.  Third, upon information and belief, Defendants wrongfully traded on material non-public information when they caused Plaintiff's stock to be heavily short sold on July 25, 2018, which further drove down Plaintiff's share price and caused another downward adjustment to the conversion price on the Notes.  Fourth, as a result of its artificially depressed share price and last-minute scramble to raise capital caused by Defendants' Misrepresentations, Plaintiff now has no choice but to attempt to raise capital on severely disadvantageous terms.  As a result of its depressed Common Stock price, the terms of such raise will almost certainly trigger yet a further downward adjustment in the exercise price of the Warrants as well, severely reducing the amount of capital

that will be provided to Plaintiff upon exercise of those Warrants.  Fifth, the decline in the value

of Plaintiff's Common Stock resulting from Defendants' wrongful conduct and

misrepresentations has impaired Plaintiff's financial and business viability, hindered its ability to

engage in other financing on favorable terms and otherwise adversely affected its standing within

the business community.

## FIFTH CAUSE OF ACTION

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

91.     Plaintiff repeats and realleges paragraphs 1 through 90 as if fully set forth herein.

92.     Defendants had a covenant and a duty under the SPA to deal with Plaintiff in

good faith and to deal with it fairly.  Specifically, the SPA contained an implied obligation on the

part of Defendants to not misrepresent their true intentions as holders of a significant percentage

of Notes and Warrants, to not trade Plaintiff's stock on material non-public information, and to

not intentionally manipulate Plaintiff's stock price to Plaintiff's and its shareholders' detriment.

93.     As further set forth above, Defendants breached their respective duties of good

faith and fair dealing by, among other things, repeatedly and falsely representing that they were

not shorting Plaintiff's stock, repeatedly and falsely representing that they would extend the

Maturity Date on the Notes, intentionally causing Plaintiff's stock price to plummet by causing it

to be short sold on a large scale, and wrongfully trading on material non-public information.

94.     Plaintiff performed all its obligations under the SPA.

95.     Plaintiff has suffered injury by reason of Defendants' breach of the implied

covenant of good faith and fair dealing and is entitled to recover damages in an amount to be

determined at trial.

## SIXTH CAUSE OF ACTION

### (Conspiracy)

96.    Plaintiff repeats and realleges paragraphs 1 through 95 as if fully set forth herein.

97.    As further set forth above, the Empery Defendants and Ayrton variously defrauded Plaintiff and otherwise engaged in tortious and deceptive misconduct.

98.    The Empery Defendants and Ayrton agreed to defraud Plaintiff by knowingly misrepresenting the fact that they were causing to be short sold Plaintiff's stock and knowingly misrepresenting their intention to extend the Maturity Date on the Notes.

99.    In furtherance of their agreement, between July 12, 2018 and July 13, 2018, the Empery Defendants and Ayrton jointly agreed to provide Plaintiff with $4 million operating capital and extend the Maturity Date by six months.  On July 13, 2018, they communicated that agreement to Plaintiff in a telephone call to Raymond Urbanski.

100.    Nevertheless, both the Empery Defendants and Ayrton failed to provide Plaintiff with $4 million of operating capital or extend the Maturity Date by six months.

101.    Upon information and belief, Defendants' participation in the furtherance of the plan to defraud Plaintiff was intentional.

102.    Plaintiff has suffered injury by reason of Defendants' conspiracy and is entitled to recover damages in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION

### (Rescission)

103.    Plaintiff repeats and realleges paragraphs 1 through 102 as if fully set forth herein.

104.    By reason of the fraud and other misconduct set forth above, Plaintiff is entitled to rescission of the SPA.

WHEREFORE, Plaintiffs respectfully demand judgment as follows:

(a)  On the First Cause of Action, awarding compensatory damages in an amount not presently ascertainable, together with interest thereon.

(b)  On the Second Cause of Action, awarding compensatory damages in an amount not presently ascertainable, together with interest thereon.

(c)  On the Third Cause of Action, awarding compensatory damages in an amount not presently ascertainable, together with interest thereon.

(d)  On the Fourth Cause of Action, awarding compensatory damages in an amount not presently ascertainable, together with interest thereon.

(e) On the Fifth Cause of Action, awarding compensatory damages in an amount not presently ascertainable, together with interest thereon.

(e) On the Sixth Cause of Action, awarding compensatory damages in an amount not presently ascertainable, together with interest thereon.

(f)  On the Seventh Cause of Action, rescission of the SPA.

(g) Awarding punitive damages in an amount to be determined by the trier of fact;

(h)  For Plaintiff's reasonable legal fees and the costs of this action; and

(i)  For such other and further relief as the Court may deem just and proper.

Dated: August 1, 2018
New York, New York

**EISNER, A.P.C.**

By: _/s/ Simon Miller_
Simon Miller
152 West 57th Street, 48th Floor
New York, New York 10019
(646) 876-2600 (o)
(646) 876-2603 (f)
smiller@eisnerlaw.com
*Attorneys for Plaintiff*